**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| BARBARA McNERNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-0704-CV-W-DGK |
| | ) | |
| LOCKHEED MARTIN OPERATIONS | ) | |
| SUPPORT, INC., and | ) | |
| PARSONS CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING SUMMARY JUDGMENT

This case arises out of Plaintiff Barbara McNerney's employment relationship with Defendants Lockheed Martin Operations Support, Inc., and Parsons Corporation, private contractors with the Federal Aviation Administration ("FAA"). Plaintiff alleges she was terminated by Defendants in retaliation for complaining to her supervisors about billing practices which violated the federal False Claims Act. Count Two, the sole remaining count in this case, alleges she was fired in violation of the "whistleblower" public policy exception to Missouri's at-will employment rule.

Now before the Court is Lockheed's Motion for Summary Judgment (Doc. 65). Lockheed argues McNerney has not alleged a sufficiently serious violation of the FCA to establish such a "whistleblower" claim. Finding that McNerney cannot establish an objectively reasonable belief that the billing policies she reported were "*serious* misconduct" that constituted "a violation of the law and of *well established* and *clearly mandated* public policy" as required by the Missouri Supreme Court in *Margiotta v. Christian Hospital Northeast Northwest*, Lockheed's motion is GRANTED.

## Choice of Law and Subject Matter Jurisdiction

As the Court noted in its order denying Defendants' motion to dismiss, Missouri law provides the applicable rule of decision in this case. Additionally, although Plaintiff has dismissed the parties who removed this case from state court, the United States and Don Sorter, the Court retains subject matter jurisdiction to hear this dispute pursuant to *Osborn v. Haley*, 549 U.S. 225, 243-45 (2007).

## Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. But the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).

**Factual Background**

For purposes of resolving the pending motion, the Court finds the facts to be as follows. Properly controverted facts, facts immaterial to the resolution of the pending motion, and argument presented under the guise of facts have been omitted.

**1.     Plaintiff McNerney's employment with the FAA and its contractors**

Plaintiff Barbara McNerney ("McNerney") began working for the Federal Aviation Administration ("FAA") in 1960 as a draftsman. In approximately 1975, McNerney voluntarily left the FAA, although she continued performing drafting work from home on an as-needed basis.

The FAA has contracted with private companies to provide the United States National Airspace System ("NAS") infrastructure to support all air operations within the United States and certain oceanic areas. This responsibility ranges from air traffic control, system security, and safety to international coordination. The FAA has a Technical Services Support Contract ("TSSC") under which it contracts with private companies for such services. By 1991, the FAA was utilizing drafters under a series of contracts, including the TSSC. Under these contracts, various companies contracted or subcontracted with the FAA to provide technical support services, and drafters were directly employed by the contractors and subcontractors rather than the FAA. The FAA is currently on the third TSSC contract which it awarded in 2001 or 2002 to Defendant Parsons Corporation ("Parsons"). Under this contract, Parsons is the prime contractor for the FAA, while Defendants Lockheed Martin Operations Support, Inc. ("Lockheed") works with Parsons as a subcontractor.

McNerney did not provide drafting services to the FAA from 1991 to 1993. In 1994, the FAA was shifting towards national contracts and requested that McNerney go to work for

Lockheed in the FAA Drafting Department at the FAA's offices in Kansas City.  Her work in the FAA Drafting Department was under the NISC contract,[1] another FAA contract for private services that had been awarded to Lockheed.

McNerney's employment with Lockheed ended in 2002, when the FAA requested that McNerney go to work for Advancia Corporation ("Advancia"), another contractor.  In approximately 2005, while employed by Advancia, McNerney's primary function switched from performing manual drafting work to providing quality assurance or quality control work for the FAA.  Her duties involved reviewing engineering drawings as they passed through the drafting department to ensure they were completed and met FAA standards.

In February of 2008, the FAA terminated McNerney's quality control position under the NISC contract because the FAA no longer had funding for this position.  When the FAA eliminated McNerney's position on the NSIC contract, Don Sorter asked Lockheed to pick up her position under the TSSC contract because he believed she provided value to the drafting department that he did not want to lose.  Lockheed had the funding under its contract to be able to pick her up and hired her to perform the position of Quality Control in the TSSC Drafting Department.  Thus, McNerney's employment shifted from Advancia back to Lockheed.

By this time, Parsons had become the prime contractor on the TSSC contract, and Lockheed Martin was a subcontractor to Parsons.  While McNerney's job title was officially that of a "drafter," she was no longer performing any drafting work, and her job duties involved quality control functions exclusively.  *One hundred percent of her time was charged to, and paid for by, the FAA.*

---

[1] The parties' briefs do not explain what "NISC" is an abbreviation for.

**2.**       **McNerney's friction with the FAA's Don Sorter between 2004 and 2006**

In approximately 2004, while an employee of Advancia, McNerney began to experience work-related issues with Don Sortor, an FAA employee serving as the coordinator of the FAA's Computer-Aided Engineering Graphics Department ("CAEG"), a position McNerney held from approximately 1994-1996 before Don Sortor took over the position. McNerney believes her disputes with Sortor stemmed from a dispute between them as to the assignments and duties of another employee, Holly Handschke.

In July 2005, McNerney complained that Don Sortor was not adhering to FAA policy and procedure. The next day, under false pretenses, Sortor attempted to eliminate McNerney's position and terminate her employment. McNerney subsequently received word from her supervisor, Ivan Hunt, that the need for manual drafting no longer existed and her position was therefore being eliminated. Hunt indicated the decision was based on information received from Sortor. At that time, McNerney was an Advancia employee and did not perform any electronic drafting, although she was capable of doing so, if properly trained.

FAA engineers responded to the announcement by expressing their belief that manual drafting was still needed. They also praised McNerney's performance. Sorter's decision to eliminate her position was subsequently reversed.

McNerney continued to assert that she was being treated inappropriately by Sortor, and in May 2006, the FAA removed Sortor from McNerney's chain of command. Sortor remained the FAA drafting coordinator for the TSSC contract and continues to serves as the FAA contact directing work to the drafting department.

**3.      McNerney complains of time charging directives**

In 2008 and 2009, after being rehired by Lockheed, McNerney recorded her time worked on the TSSC contract in three locations: her Lockheed time card, an FAA drawing management system called Drafting Tracker, and a Lockheed spreadsheet.

On September 30, 2009, McNerney received several rolls of drawings for various locations to be scanned into PowerWise, the document system for FAA engineering projects. The drawings involved different projects at different locations.  McNerney checked the drawings and realized that numerous quality control problems needed to be resolved before the documents could be entered into the system.  McNerney, however, had not been given a tracker, work release number or job charge number ("JCN") to which she could record her time.

At this time, McNerney, although a Lockheed employee, followed a chain of command made up entirely of Parsons employees for task-related matters.  Jelani Agu-Nkosi, a Parsons employee, was the day-to-day operations supervisor of the drafting department and McNerney's immediate supervisor.

When McNerney did not have a number to which she could charge her time in September 2009, she asked Agu-Nkosi for the charge information.  Agu-Nkosi told McNerney that Sortor, the FAA liaison for the contractors performing drafting work, had told him "to spread the hours out among other projects."  Agu-Nkosi did not instruct McNerney to bill the time to any specific projects.   McNerney told Agu-Nkosi that she could not hide seven hours of work, and that she assumed her quality control hours were being "monitored."  *The work McNerney needed to perform with regard to the drawings was work that was properly chargeable to the FAA, and all of her time was chargeable to the FAA.*

The following day, October 1, 2009, McNerney sent Agu-Nkosi an e-mail stating that she still needed numbers to which she could charge the previous day's work. Agu-Nkosi responded by telling plaintiff that Sortor had asked her to charge time spent on the drawings to "Work Release 97."

Work Release 97 is a general work release to which employees working on the TSSC contract could charge overhead and other non-specific time. At one point, drafters charged all of their time to Work Release 97, but by 2009, the FAA revised its charging system by breaking down the work performed into more specific "platforms," with each platform having its own work release numbers. This allowed the FAA to see how much a project cost and to ensure project costs were approved and within budget. While employees in the drafting department continued to utilize the general work release under some circumstances, the FAA directed them to charge time to the more specific work release numbers for work on specific platforms. Following this change, members of the drafting department expressed confusion about the new procedure to charge their time.

Eventually, McNerney charged her time for the work on the multiple drawings to Work Release 97.

On October 7, 2009, McNerney sent Agu-Nkosi another e-mail regarding five hours of work she charged to a project for William Johnson, one of the FAA engineers, who had complained about the amount of time McNerney spent on his project. In the e-mail, McNerney explained she did two hours of quality assurance work, and another three hours, at least some of which she believed was "to complete the documentation for the drawings," which "is part of quality control." In the same email she complained that "I have been told on numerous

7

occasions to 'spread out' time spent on duties other than QA and attending meetings to projects that have a JCN" and that she had "concerns for charging time."

This episode was not an isolated incident. McNerney was told by others to "spread her time" or "spread the cost" on numerous occasions. McNerney was concerned that spreading charges out across various projects or a job other than the one for which the work was performed was illegal and that it could lead to certain projects being overbilled.

McNerney had no knowledge, however, as to how Parsons and Lockheed Martin utilized the information entered by her on time cards, spreadsheets, or other charging materials and whether it affected the overall amount billed to, and paid by, the FAA.

**4.      Plaintiff's termination**

After McNerney began questioning her time recording practices, Sortor contacted Conner and Rich and informed them that the FAA no longer wished to fund McNerney's position and wanted quality control duties to be spread among the drafters. Defendants and the FAA began raising bogus performance issues after she began complaining about time recording issues.

The precise circumstances and timing of McNerney's termination are in dispute. The parties agree that Agu-Nkosi was not a participant in the discussions with Sortor, Conner, Rich or McNerney regarding the alleged "defunding" of her position. Agu-Nkosi only learned McNerney's quality control position was being defunded from McNerney herself after she already had been notified of the decision.

Conner and Rich instructed McNerney to report the following day to an office in Kansas where other employees were working on the TSSC contract, explaining that they had a backlog of clerical and administrative work with which McNerney could assist on a short-term basis. In fact, there was no work to be done and McNerney sat in a cubicle there for four weeks.

Following the defunding of McNerney's position, Lockheed explored whether any other positions were available that McNerney could perform. At the time of her separation from employment, employees in the drafting department were no longer performing manual drafting, and McNerney had no experience with computer-aided drafting. Although McNerney had not been trained on the electronic drafting software, she could have learned it in two weeks. McNerney was not interested in obtaining a clerical or administrative position with Lockheed.

On November 20, 2009, Lockheed informed McNerney that she was being laid off due to the reduction in force initiated by the FAA effective December 4, 2009. Lockheed Martin encouraged her to pursue job opportunities within the company by viewing and applying for positions through a company Intranet system. McNerney searched but did not find any jobs within her expertise and did not apply for any alternative positions.

On June 22, 2010, McNerney filed the present lawsuit in the Circuit Court of Jackson County, Missouri, naming Lockheed, Advancia, Parsons, and Don Sorter as Defendants. The Federal Government and Don Sorter subsequently removed the case to federal court. Plaintiff then dismissed Don Sorter and Advancia, leaving only Lockheed and Parsons as Defendants.

## Discussion

"The at-will employment doctrine is well-established Missouri law." *Margiotta v. Christian Hosp. Ne. Nw.,* 315 S.W.3d 342, 345 (Mo.2010) (en banc). "In the absence of an employment contract with a definitive statement of duration of employment, 'an employment at will is created.'" *Frevert v. Ford Motor Co.*, 614 F.3d 466, 470-71 (8th Cir. 2010) (quoting *Margiotta*, 315 S.W.3d at 345). "An employer may terminate an at-will employee for any reason or for no reason." *Margiotta*, 315 S.W.3d at 345 (internal quotations and citations omitted). "As

9

a matter of law, the discharged at-will employee has no cause of action for wrongful discharge."

*Fleshner v. Pepose Vision Inst., P.C.,* 304 S.W.3d 81, 91 (Mo.2010) (en banc).

This doctrine is not absolute, however. *Margiotta*, 315 S.W.3d at 346. "An employer cannot terminate an at-will employee for being a member of a protected class, such as race, color, religion, national origin, sex, ancestry, age or disability." *Id.* Missouri also recognizes a public-policy exception to the at-will employment doctrine. *Id.*

> Where an employer has discharged an at-will employee because that employee refused to violate the law or any well established and clear mandate of public policy as expressed in the constitution, statutes and regulations promulgated pursuant to statute, or because the employee reported to his superiors or to public authorities serious misconduct that constitutes violations of the law and of such well established and clearly mandated public policy, the employee has a cause of action in tort for damages for wrongful discharge.

*Fleshner,* 304 S.W.3d at 91 (internal quotations, alteration, and citation omitted). Where a plaintiff claims that she was wrongfully discharged for "reporting violations of law or public policy," she "must show that [s]he reported to superiors or to public authorities *serious* misconduct that constitutes a violation of the law and of *well established* and *clearly mandated* public policy." *Margiotta,* at 346-47 (emphasis in original). "[A] wrongful discharge action must be based on a constitutional provision, a statute, a regulation based on a statute or a rule promulgated by a governmental body." *Id.,* at 346. In the absence of "such explicit authority, the wrongful discharge action fails as a matter of law." *Id.*

To establish wrongful discharge in violation of public policy for "whistleblowing," a plaintiff must show (1) that the employer's conduct "violated a law, regulation, or some other clear statement of public policy;" (2) that the plaintiff "'blew the whistle' by reporting this violation to a superior, decisionmaker, or public authorities;" and (3) that the reporting was a

"contributing factor" to the employer's decision to end the plaintiff's employment. *Bazzi v. Tyco Healthcare Group, L.P.*, 652 F.3d 943, 947 (8th Cir. 2011).

Lockheed contends it is entitled to summary judgment because McNerney cannot establish any of these elements. Specifically, it argues: (1) McNerney cannot show that the directive to charge her time to the Work Release 97 code in the September 30, 2009 incident, or to generally "spread the cost" in other, unspecified incidents, violated the False Claims Act ("FCA"); (2) McNerney did not report the violation to a superior, decisionmaker, or public authorities; and (3) McNerney cannot establish that that her whistleblowing had a causal connection to her termination.

## I.      McNerney can establish she reported the alleged violations to her supervisors.

The Court finds no merit to Lockheed's second argument. As McNerney argues in her brief, her own testimony clearly asserts that she complained about the alleged violations to her supervisors numerous times. This is enough to survive summary judgment. The Court also notes that Lockheed appears to have abandoned this argument in its reply brief by its silence on this point. Accordingly, this portion of the motion is denied.

## II.      McNerney can establish that her "whistleblowing" contributed to her termination.

The Court also holds that McNerney can establish by reasonable inference the third element, that her "whistleblowing" was a contributing factor that led to her termination. As an initial matter, McNerney is not required to show that her complaints were the sole cause, or even a substantial factor, in her termination. She is only required to show it was a *contributing factor*. *Fleshner*, 304 S.W.3d at 94-95.

Viewed in the light most favorable to McNerney, and giving her the benefit of all reasonable inferences, the evidence on the record supports a finding that McNerney always had

good performance reviews until she began raising her concerns about how she should record her time.  Shortly thereafter, her position was eliminated and she was exiled to a do-nothing position for a month while Lockheed, in conjunction with Sorter, prepared to terminate her under the guise of a reduction in force.  While there were probably other reasons she was terminated, including her long-standing poor relationship with Don Sorter, a reasonable jury could find that her whistleblowing was at least a contributing factor in her dismissal.

Accordingly, this portion of the motion is denied.

### III.	Plaintiff cannot establish serious misconduct that constitutes a violation of law.

The one element of a whistleblowing claim McNerney cannot establish, however, is that the billing practices she complained about violated a law, regulation, or some other clear statement of public policy.  As noted above, where a plaintiff claims that he was wrongfully discharged for "reporting violations of law or public policy," she "must show that [s]he reported to superiors or to public authorities *serious* misconduct that constitutes a violation of the law and of *well established* and *clearly mandated* public policy."  *Margiotta,* at 346-47 (emphasis in original).  The plaintiff bears the burden of showing not only that he had a good-faith belief that the employer was violating a public policy, but "that this good-faith belief was an objectively reasonable one." *Bazzi*, 652 F.3d at 948.

McNerney contends that the misconduct she complained of here violated the public policy behind the False Claims Act, which is to protect the United States from materially false or fraudulent attempts to cause it to pay out money.  *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998).[2]  McNerney has identified two practices here that she contends violated

---

[2] Although the text of the statute imposes liability on "[a]ny person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a) (2009), the Eighth Circuit has indicated that a showing of materiality is implicit in

12

Case 4:10-cv-00704-DGK   Document 87   Filed 06/12/12   Page 12 of 14

this public policy.  First, that on October 1, 2009, her supervisor directed her to charge time spent on addressing quality control problems to "Work Release 97," a general entry to which employees could charge overhead and other non-specific time.  Second, that on numerous occasions she was told to "spread out" her time spent on duties other than quality assurance and attending meetings to projects with specific job charge numbers.  Plaintiff intimates that these practices led to false claims being presented to the federal government.

While these practices raise eyebrows and may not comport with the FAA's revised time recording guidelines, Plaintiff has not shown that they resulted in any financial loss, or could reasonably be inferred to have resulted in any financial loss, to the United States, thus these practices do not implicate the policy animating the False Claims Act.  At the outset, the Court notes it is uncontroverted that all of the work McNerney performed during this period was properly chargeable to, and paid for by, the FAA.  She was not working on any other projects for any other clients such that her time could have been improperly billed to the United States, nor was she inflating her time spent working on any project.  In short, all of her time was spent working on projects for the United States.  With respect to the October 1, 2009 incident, wherein McNerney was instructed to charge her time to the Work Release 97 code, given that this instruction originated with Don Sorter, the FAA employee who was coordinating the project, use of this code was objectively reasonable.  There is also no indication here that had McNerney used a different billing code, or not spread her time out across several billing codes, that the FAA would have paid any less than it did.

Consequently, McNerney has not established that she had an objectively reasonable belief that the billing policies she reported were "*serious* misconduct" that constituted "a

the statute.  *Hays v. Hoffman*, 325 F.3d 982, 992 (8th Cir. 2008) (citing *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 887 (8th Cir. 2003).

violation of the law and of *well established* and *clearly mandated* public policy" as required by the Missouri Supreme Court in *Margiotta*.  Because she cannot establish the first element of a wrongful discharge in violation of public policy for "whistleblowing" claim, the Court must grant Lockheed's motion for summary judgment.

## Conclusion

For the reasons discussed above, Defendant Lockheed's Motion for Summary Judgment (Doc. 65) is GRANTED.

**IT IS SO ORDERED.**

Date:    June 12, 2012                                        /s/ Greg Kays
                                                             GREG KAYS, JUDGE
                                                             UNITED STATES DISTRICT COURT